CHARLES S. CALDWELL ET AL. v. A. McC. KIMBROUGH ET AL.

[45 South., 7.]

MORTGATE AND DEEDS OF TRUST. *Debt due in installments. Power to declare all mature.*

The provision in a mortgage or deed of trust, securing a debt by installments, that on default in payment at maturity of any of the installments, all of them, whether due or not, shall at once become due and collectible at the option of the creditor, and notice of the exercise of the option shall not be necessary:—

(*a*) Is valid and in no sense a penalty; and

(*b*) Is not waived by the creditor failing, at the request of the debtor, to act at once; and

(*c*) After exercise of the option by the creditor a tender by the debtor of the amount due at the time of the default will not defeat the creditor's right; and

(*d*) The right to enforce payment of the entire debt is not lost, because the declaration of maturity of all is not immediately followed by a sale, where its postponment is at the instance of the debtor, or his administrator, to give opportunity to raise money to discharge the debt.

From the chancery court of Leflore county.

HON. PERCY BELL, Chancellor.

Kimbrough and others, appellees, were complainants in the court below; Caldwell and others, appellants, were defendants there. From a decree overruling a motion to dissolve an injunction defendants appealed to the supreme court.

The facts are stated in the opinion of the court.

*Harris & Powell* and *Edward Mayes*, for appellants.

It will be seen from the correspondence set forth and from the answer and other exhibits thereto that at no time from the writing of the letter of December 12, 1905, by Caldwell, informing the administrator that the beneficiaries in the deed

of trust would proceed to assert their rights under the deed according to its terms, in other words declaring the whole debt due, to the time of the filing of the bill, was this declaration of maturity ever waived or dismissed or recalled or anything done, or said, from which it could be inferred that the maturity of the debt was not at all times insisted upon. The fact that the whole debt was declared due and considered due was kept prominently in view in all the correspondence and negotiations which took place between the parties and their attorneys. This is not only shown by the letters referred to, but is clearly alleged and set forth in the answer. The only thing which was considered was a postponement of the time for the sale, the postponement being at the repeated and earnest solicitations of the administrator and of the heirs and their attorneys, to give an opportunity to raise the money, if possible, to pay off the whole debt, or to have the sale take place at a time when it would likely be more beneficial to the estate. That the sale for the whole debt was to take place was kept prominently in view, there was merely a question of postponement, the maturity of the debt was continuously asserted and continuously recognized. All of the parties concerned understood this, and it was with reference to this that the negotiation both written and verbal, in which the parties and their representatives all participated, were had. The administrator as shown in his letter of December 13, 1905, above set forth, insisted upon a postponement upon the ground that if a sale were to take place in December it would inevitably bankrupt the estate, and impoverish the heirs. Caldwell called the attention of the administrator to the fact that the trouble could have been avoided if he, the administrator had applied to the payment of the first interest notes the money which he had applied to the payment of his own debt. Yielding to the solicitations of the administrator and the attorneys for the heirs at law, the beneficiaries agreed to postpone the sale until October 1, always recognizing the maturity of the whole debt, and insisting upon

the payment of it all. There was a further postponement of the sale from October 1 to October 10, then at the earnest solicitation of Yerger, representing all of the appellees here, the sale was further postponed until the first Monday in November, with the distinct understanding that if the debt was not paid off by that time the sale should proceed without further objection. There was never a postponement of the declaration of maturity; there was never a recalling of the declaration, but from December 12, 1905, until the filing of the bill, the whole debt was treated as being due and repeatedly so declared, and as shown by the answer after every opportunity had been given and nothing definite could be determined upon, the appellants acting strictly within their legal rights, strictly within conformity with their agreement with the parties, advertised the property for sale. There was no misleading, no fraudulent conduct — the right to sell for the whole debt was continuously asserted, the fact that the sale would take place was positively and continually asserted, and there was merely a postponement of the time of making the sale, this wholly for the benefit of the appellees. As stated in the foregoing part of this brief, on the day that the sale was to take place after the advertisement, the appellants were enjoined.

The bill only partially stated the case. An answer was filed by the beneficiaries, putting before the court the whole case, denying the equities of the bill and setting forth the whole case. The answer being drawn under the well settled rule of equity practice that an injunction will be dissolved on bill and answer, where the answer sworn to is responsive to the allegations of the bill, and denies the equities of the bill. The rule is that if the complainant states an act, transaction or contract as the foundation of his equity, the defendant has the right to state the whole of such act, transaction or contract as in truth it was. Otherwise the plaintiff, by giving only part of the transaction, if the defendant must admit that part and cannot go on to describe truly all the parts of it, the grossest

injustice might be done. The defendant must answer every material allegation in the bill, whether specially interrogated thereto or not, and unless he states the act or contract fully as it truly was, how can he conscientiously swear that the facts in his answer are true? Half a fact or half a contract is not the truth. 1 Beach on Equity Practice, sec. 370; *Davis* v. *Hart,* 66 Miss., 642; *O'Connor* v. *Stark,* 59 Miss., 481; *Hutchison* v. *Lightcap,* 52 Miss., 508; *Magee* v. *White,* 31 Miss., 41.

There were no exceptions to the answer and no proof taken.

Complainants proceed upon two assumptions:—

1. That as the defendants had not followed their declaration of maturity in December, 1905, at once by a sale, the declaration must be held for naught and treated as though no such declaration of maturity had been made, and therefore they had a right at any time to pay or tender the amount of the past due interest and thereby prevent a sale of the property on that account.

2. That even if they should be wrong in their contention as to the meaning of the clause of the trust deed set up in the bill, they had a right to pay or tender the interest before a sale actually took place and prevent a sale of the property.

In order to consider this question intelligently it is first necessary to determine the effect of the provision in the trust deed in this case, which is a familiar provision and common to many trust deeds and contracts. We refer to the provision that in the event of the failure to pay any part of the debt secured by the mortgage, when the same matures the whole debt may be declared due, at the option of the beneficiaries. It was insisted in the court below that this clause provides a penalty or is in the nature of a penalty or forfeiture against which a court of equity would relieve, and many authorities were cited by counsel to the effect that a court of equity would relieve against penalties and forfeitures. The power of a court of equity to relieve against penalties and forfeitures is not denied by us or in any way controverted. It is one of the oldest and best

established grounds for equitable relief but is confined to well defined and narrow limits, and we insist that the question is not involved in this case. Counsel in the court below, among other authorities, relied·upon 1 Pom. Eq., secs. 433, 436, 451, 455. We are in no way questioning the soundness of this rule, it is too well established to admit of controversy. But Pomeroy in the same volume and in the same chapter referred to by counsel, states that the case which we have here is an exception to the rule. As an illustration of what is not a penalty. he says at section 439: "It is, therefore, well settled by the overwhelming weight of authority that if a certain sum is due and secured by a bond, or bond and mortgage, or other form of obligation, and is made payable at some future day specified, with interest thereon made payable during the interval at fixed times, annually, semi-annually or monthly and a further stipulation provides that in case default should occur in the prompt payment of such portion of interest at the time agreed upon, then the entire principal sum of the debt should at once become payable, and payment thereof could be enforced by the creditor, such a stipulation is not in the nature of a penalty, but will be sustained in equity as well as at law." "Such a stipulation has nothing in common with a penalty and is as valid and operative in equity as at the law." Citing numerous authorities.

"The court has no power to relieve the mortgagee from a forfeiture of condition that the whole principal shall become due at the election of the mortgagee upon a failure to pay the interest, or to order a stay of proceedings until further default, unless fraud or improper conduct on the part of the plaintiff is proved. The mortgagor negligently permitted the time to pass, and the whole debt thereby to become due, cannot relieve the forfeiture by paying into the court the interest or installments on which the forfeiture occurred." Jones on Mortgages, 1185.

"When the mortgagee has made his election to regard the

principal sum due under a stipulation that he shall elect that upon the nonpayment of interest thirty days after it becomes due, he cannot be compelled to waive this provision and accept the interest." Jones on Mortgages, section 1186.

" A stipulation in the mortgage that in case of default of the payment of the interest the principal shall become due immediately and the mortgagee shall proceed to foreclose, is not a penalty nor a forfeiture and equity will not relieve the part therefrom." 8 Am. and Eng. Dec. in Eq., 225.

" Courts can only enforce a contract as made and do not sit to make contracts for the parties, or relieve them from the consequence of the breach of their agreement. It is not for us to inquire into the purpose of the parties in introducing a condition into the notes or to express the opinion that in this respect the contract was a harsh or unfair one. All we can say is that the party voluntarily entered into the contract and they are bound by it and must submit to the consequences provided for in the case of its breach." *Malling* v. *Bronson,* 37 Neb., 608.

The same rule is announced in the well considered case of *Swearingen* v. *Lahner et al.,* 26 L. R. A., p. 765.

The court is also referred to the following well considered authorities bearing on the question: *Malcolm* v. *Allen,* 49 N. Y., 448; *Moor* v. *Sergeant,* 112 Ind., 484; *Lincoln* v. *Corbett,* 31 Texas Civ. App., 352; *Ferris v. Ferris,* 28 Barbour, 33; *Malling* v. *Bronson,* 37 Neb., 3; *Adams* v. *Rutherford,* 13 Ore., 78; *Conn. Ins. Co.* v. *Westerhoff,* 58 Neb., 379.

This rule is so well settled that we would deem it unnecessary to cite authorities were it not for the fact that the contrary view was insisted upon by the counsel in the court below. We call the attention of the court to these authorities that it may see the ground upon which the rule rests is firmly established. That the provision is a matter of contract and not a penalty or forfeiture; that when a breach occurs the rights of the party become fixed and they must abide by their contract and equity

will not relieve against a contract voluntarily made, or make a different contract.

It is upon this principle that the well considered authorities rest the conclusion that after the declaration of maturity, after the breach of the contract, a tender of interest or the past due note will not relieve the parties from the consequence of the breach. The court would be saying in one breath, " We will not relieve against this breach," and in another, " We will, although the parties have contracted and the conditions have arisen which fixed their rights, we will allow the delinquent party to avoid this contract by tendering the past due installment before a sale of the property takes place." The precise question involved was passed upon in the cases which we have cited. The principle was clearly announced in the case of *Swearingen* v. *Lahner et al., supra.*

In the case of *Conn. Ins. Co.* v. *Westerhoff,* 58 Neb., 379, the question was very maturely considered. This was a case of tender of the overdue interest after the default and the court held that this tender did not deprive the mortgagee of his right to foreclose, citing *Swearingen* v. *Lahner.*

In the case of *Magnusson* v. *Williams,* 111 Ill., 450, the court held that a mere offer by the debtor to buy the notes and deed of trust given by him to secure the debt, before a sale will afford no equitable ground for setting aside the sale and allowing a redemption. The most the debtor may require is, that the holder of the debt accept the entire debt and enter satisfaction of the trust deed.

In the case of *Hoodlens* v. *Reed et al.,* 112 Ill., 105, the court announced the same principle.

In the case of *Van Velissinger* v. *Lenz,* 171 Ill., 162, the court held that the acceptance of interest after a declaration of maturity would not effect the right to proceed to sell, or operate as a waiver of the notice, unless acceptance was so taken.

In the case of *Adams* v. *Rutherford,* 13 Ore., 87, the court will find a very full and elaborate discussion of the subject.

In that case the fact that the creditor had purposely absented himself in order to prevent a payment or a tender was the determining feature in the case; but there is no such feature in the case at bar. The Oregon case is an instructive one on the general principle contended for here. In other words treating this provision as the matter of the contract and not a penalty or forfeiture, the court hold that after a breach, equity will not relieve by a mere offer to perform after the breach.

In the court below counsel for the appellee relied upon a statement in the text, 28 Am. Eng. Enc. of Law, 780, which is as follows:

" When there is a series of notes and a provision is inserted in the deed of trust executed to secure them, to the effect that upon the failure to pay any one note all shall thereupon become due, a debter may at any time stop a threatened sale under the power upon making a tender of the amount of the note then due, together with the accrued costs. The creditor in such case has no right to insist upon the payment of the entire debt."

In support of this the author cites some Missouri cases, but leaves entirely out of view the cases which we have cited above, which clearly establish the contrary rule.

We find the correct rule laid down in the 9 Enc. of Pleadings and Practice, 237, as follows:

" Where it is stipulated that the whole debt shall become due on default in the payment of the interest, time is of the essence of the contract, and foreclosure may proceed although after default tender of the interest in full or the interest and costs has been made.

" The acceptance of interest by the obligee or a bond or note after forfeiture, maturing the whole debt is not a waiver of the default or of a subsequent one of like nature unless the mortgagee has led the mortgagor to believe that he would not insist upon the strict performance of the contract."

This court recognizes the principle. *Jones* v. *Weir,* 84 Miss., 600.

It is true that the Missouri cases seem to support the contention of the appellees, but these are the only cases that we have been able to find which afford any support for their contention and they are not supported either by reason or authority.

It must be borne in mind that in the case at bar there was at no time any misleading, any attempt to throw the debtor off guard. The administrator failed to pay the interest, failed to give any assurance, or promise that it could be paid, but very promptly paid himself out of moneys which could have satisfied the interest notes. Although often called upon to give some positive assurance of the payment of the interest notes, none was given and thereupon the whole debt was formally declared due and continuously insisted upon. The intent to make the sale of the property under the declaration of maturity was never abandoned. The rights of the parties had become fixed under the contract, no undue advantage is suggested. After having the sale postponed from time to time for their benefit; under the pretense that a purchaser, or at least a party who was willing to assume the debt had been found, a pretender was made with the positive assurance that the tender was in no way to affect the rights of the beneficiaries to proceed under their trust deed to sell the property. This fact was set up in the answer and sworn to and not controverted.

Surely such a tender or a pretended tender could not affect the rights of the beneficiaries. But it is well settled aside from this that if the tender had been made unconditionally and for the avowed purpose of stopping the sale it would not avail after the declaration of maturity.

The only question then which remains for consideration is whether under the clause of the deed set up in the bill, the declaration of maturity must be held for naught, and the tender be considered as being made with no intention to declare the debt due. In other words would this declaration of maturity

be held for naught because it was not immediately followed by a sale of the property. We will now consider that question.

.The foregoing authorities fully establish the general proposition that when an option to declare the whole debt due because of a failure to pay the interest promptly, is once exercised, the debtor cannot afterwards set aside that declaration, restore the *status quo,* and arrest the sale by a tender of the overdue interest and expenses.

Indeed the bill in this case does not seem to rest on that ground, but advances for its strongest reliance, the alleged effect of a certain special clause in the trust deed, of the following tenor:

" In the event maturity of the unpaid portion of the debt is declared, but no sale is actually made, such declaration of maturity shall be held for naught, and the notes hereby secured shall be deemed to mature as provided on their face."

The bill avers that the declaration of maturity was made December 12, 1905, because of failure to pay the interest notes due November 14, 1905; and alleges, further, that the amount due on such notes and expenses (being all that was then due) was tendered on October 5, 1906; yet, still, that defendants were wrongfully proceeding to sell for the whole debt. Referring to the clause quoted above, the bill then alleges that:

" Defendants abandoned and waived their right to foreclose their deed of trust at that time, by reason of their failure to follow said declaration, according to the terms and provisions of said deed of trust, by a sale of said property. In other words, your complainants charge that, by the very terms and provisions of said deed of trust, a declaration of maturity and of an intention to foreclose the deed of trust, must be followed at once by a sale of said property; or in default thereof, said declaration is, by the very terms of said deed of trust, held for naught, and the notes hereby secured shall be deemed to mature as provided on their face."

The bill nowhere shows either that the delay in selling was

in any wise prejudicial to complainants, or that it was in any wise beneficial to defendants; it shows no elements of estoppel; but its claim is based on the bald proposition that, having declared the whole debt due, defendants were obliged by the very terms of the trust deed (and by force of those terms alone) to proceed at once to sell; failing which, and without any regard to any motive of kindness to the debtor, or any yielding to his importunities for a little time in which to make business arrangements which shall lead to a temporary indulgence, the declaration is to be held for naught, and the right to sell be lost, and the notes be deemed to mature as provided on their face. In other words, having once declared the debt due, the creditor is by the terms of his own deed, forced to press the debtor immediately to the wall, and is denied the power to exercise any indulgence or spirit of kindness whatever, but must proceed to the utmost rigid extremity, or abandon his right altogether! There can be no middle course, by whatever motive inspired.

The bill further suggests a claim (it does not expressly so charge) that having once declared a debt due, without proceeding to sell at once; from that time forth the notes are to be deemed to mature as provided on their faces, and there could be no subsequent declaration, whatever subsequent default might occur.

As an abstract proposition, and considering the clause in question without reference, for the present, to any special facts of the instant case (of which, later), we deny that the interpretation advanced by the bill and made the real basis of its claim, is correct.

We deny that a mere indulgence in the matter of the time of sale extended after a declaration of maturity, but extended without any other evidence of an abandonment of the claim of maturity and of the right to sell for the whole debt, does of itself operate as such abandonment and waiver. The deed on its face imparts no such idea; and complainants in their bill, while speaking of the " very terms of said deed," are yet compelled,

in order adequately to express their claim, to interpolate into their statement the words " at once," which are not in the deed.

It is elementary that in the construction of any clause of an instrument, the instrument as a whole is to be considered, and such clause should be interpreted, if possible, as part of the general instrument, and in the light of the other germane provisions, if any.

This deed of trust on its face expressly recognizes the possibility and the right in the creditor and his trustee, after default made, and a declaration of maturity in full, and an advertisement of sale, either (1) to postpone the sale, or (2) adjourn said sale, from time to time for any length of time at discretion; or (3) to dismiss, or not to make said sale. In other words, after declaration of maturity and advertisement of sale, the trustee, without readvertising, is authorized to postpone the sale from time to time, for any length of time, at his discretion; or he is authorized to adjourn the sale from time to time for any length of time at his discretion; or he is authorized to dismiss, or not to make such sale; and in connection with the latter power, and in the very same clause in which it is conferred, it is also stipulated that the authority and powers given hereunder shall not be discharged by their exercise in case of any default or violation, but can again be exercised as often as default or violation may exist.

Thus this deed, in language, as clear as it can be framed, expressly recognizes the distinction between a postponement or adjournment on the one hand, and the dismissal of, or failure to make sale, on the other. This is a simple and practical and clear distinction. Default and maturity are declared, and a sale is advertised; but in the meantime negotiations arise for an adjustment. As, a means of facilitating this negotiation, and disembarrassing the same of legal complications, it is expressly stipulated in the deed that there may be a postponement or an adjournment from time to time at the discretion

of the trustee, on the one hand, or a dismissal of the sale entirely and a determination not to make the same, on the other.

In view of the fact that the trust deed expressly stipulates on its face that the trustee may, in his discretion, postpone or adjourn the same from time to time, and for any length of time, how can it be even plausibly contended that such postponement or adjournment, when made, causes the loss of the right to sell entirely, even if it be conceded that such loss of the right to sell occurs only by tender of the overdue payment? For what is the sale which the trust deed declares may be postponed "from time to time, for any length of time, at discretion"?    It is clearly and indisputably, by the very terms of the trust deed, that sale which is to be made for the collection of the entire debt.    That is the sale about which these provisions are made.    There can be no doubt about this; because later terms of the instrument, in its directions to the trustee as to the disposition to be made of the proceeds of such sale, declare, amongst other things, that the trustee shall pay over the full amount of the debt due, and owing, and herein secured, both principal and interest, etc.

Moreover, we call the court's attention to the express provision in the trust deed, in which it is declared that in the case of the default and declaration of maturity the trustee shall take "possession of the real estate and personalty hereby conveyed . . . and then or later, either with or without entry, sell the same at public auction for cash."

Here then, we have the express declaration that such sale, when it can be made, shall be made "then or later."    Words could not be plainer; and yet the whole contention of the bill is that the sale, if made, must be made then, and not later.

The clause immediately under consideration, and as to the meaning of which there is controversy here, clearly contemplates and relates to, not an adjournment or postponement, but a definite dismissal of the sale and abandonment thereof. The provision, as applied to that course of action, is sensible,

intelligible, and has its obvious use. It might very easily be that the conditions surrounding the sale should be such that in determining whether the sale about to be made shall be dismissed or not, the statute of limitations, and the possibility of its running against the notes as of the date when the declaration of maturity was declared, would cut a very important figure; and this consideration might be a very material and embarrassing factor in the determination of a creditor to dismiss a proposed sale, and give the debtor another chance of an indefinite character, as distinguished from a mere question of a postponement of the sale with a threat of sale immediately hanging over the debtor and his estate continuously.

In addition to what has been said above we must call the attention of the court to the fact that the bill which is very artfully drawn sets forth only part of the clause under consideration. It isolates a part and leaves out of view a very material qualification of the part set forth in the bill which we think fully supports our position. We will set out the entire clause: " In the event maturity of the unpaid portion of the debt is declared, and no sale is actually made such declaration of maturity shall be held for naught and the notes hereby secured shall be deemed to mature as hereby provided on their face; and it is distinctly agreed that no sale made in good faith by the parties of the second part or any successor shall be void if any portion of the debt hereby secured or to be secured, is in default at the time of the sale. And that the right to declare due and direct the trustees to sell shall exist so long as any breach of a condition of a default or other failure exists, although such breach may have been made on the ground of former declaration."

We must not overlook an important distinction. A debt is one thing; the security for it is another; nothing can be plainer than that. Here, the security is the land in its mortgaged status. True, that on the death of Morgan the land descended to his heirs, and became their property; but it so descended by

operation of the law; and also by operation of the law, descended charged with the intestate's debts.   It would have been so charged even if there had been no mortgage.   The practical effect of the mortgage is only to give a priority to the mortgagee over other creditors, and to furnish a certain process of collection.

The debt is one thing; the mortgaged land another.   The title to the mortgaged land descends to the heirs; and if any of them be minors, then their legal representatives, *quod hoc,* are their guardians, not the administrator.   On the other hand, the obligation of the debts passes to the administrator, who is the legal representative of the deceased, and not to any heirs or guardians of minor heirs.

Whether a debt claimed against the decedent is due and exigible or not, is a matter primarily for the administrator, who is, as to this, the legal representative, and the statutory agent, of the decedent; and it is not for the heir.   The heir may have a practical interest in that question, but not a legal one; as to that, it is the business of the administrator.   Suppose the appellants had sued at law on their notes; with whom would the defense of premature suit lie?   With the administrator, primarily, certainly, and not with the heirs.   It might not concern them under some conditions, even as a practical matter.

Now, the controversy in this case, is not as to the title of the heirs to the lands; it is not even as to the liability of those lands to the debt; it is only to the remedial question of the present exigibility of the debt — a mere question of due, or not due.   As to that question the administrator is the legal representative, and the actor, quite independent of, and apart from, any legal relation between him and the heirs.

He can by his misconduct in dealing with the creditor, estop the estate as to such question; and he has so done in this case. We do not mean, of course, that an administrator can by his admissions or his acts subject the estate to a substantial liability otherwise nonexistent.   We do not antagonize the doc-

trine of *Glenn* v. *Thistle,* 23 Miss., 42 and *Lewis* v. *Lusk,* 35 Miss., 696. This is quite a different question. It is one of remedy merely, and not of ultimate liability. It is a question which necessarily involves on the administrator to deal with, and touches what, in the conduct of the mere settlement of the estate " he does in the management of the estate while in his hands," as observed by the court in *Duncan* v. *Watson,* 28 Miss., 187, 207. See *Pittman* v. *Pittman,* 59 Miss., 203.

This negotiation was within the power of the administrator to conduct. He cannot so conduct it as to cause the creditors to fall into a trap, and lose a vested and perfect right to sell, by either his own inconsistency or disingenuousness in his official dealings. It was, throughout, a transaction between the creditors and himself; and he cannot win an advantage for the estate by inequitable conduct or by fraud. He is estopped, even in his representative capacity. 18 Cyc., 211, title K.—Estoppel.

*Monroe McClurg* and *Yerger & Hughston,* for appellees.

Counsel for appellant in insisting that a denial of all the equities of bill in a sworn answer entitles them to a decree loses sight of the fact that the bill waives an answer under oath and the authorities cited by them do not apply, since the rule laid down in *Magee* v. *White,* 31 Miss., 41, has been abolished in this State, where the bill is sworn to. Code 1906, § 586.

The bill in this case not only waived an answer under oath but was itself sworn to and the answer could have no more weight than the bill, even if it could have been admitted as evidence; but the waiver of answer under oath destroys the answer as evidence. Code 1906, § 585. *Davis* v. *Hart,* 66 Miss., 642, is not a case in point and does not control under the pleadings of this case.

The whole case rests on the construction of a few provisions of the trust deed; and the main question presented is whether the holders of the notes had in fact exercised their option of

having the unpaid principal of the debt with accrued interest become due and collectible, before the tender was made; in other words, the question is whether a mere declaration on the part of the holder of the note that he would proceed to exercise his rights under the deed of trust in such an exercise of the option given as would cause the entire debt to become due and collectible, and deprive the debtor from redeeming his property by paying the debt as provided on the face of the notes; or whether something else is required to be done before the equity of redeeming as provided in the notes is cut off.

One of the provisions of the trust deed with reference to the subject matter here is that no notice of the exercise of such option shall be necessary; a careful reading of the entire trust deed will show that the same was very carefully prepared by a skillful conveyancer who was familiar with the various rulings of the court, and he must have been familiar with the conflict of authority as to the necessity of notice of the election on the part of the holder of the notes before suit could be brought; since in Wisconsin notice is held to be necessary, *Basse* v. *Gallegar,* 7 Wis., 57, while other jurisdictions hold that the commencement of an action to foreclose upon default in payment of interest is notice of the exercise of the option to treat the whole amount due. *Bank of Commerce* v. *Scofield,* 126 Cal., 156.

The conveyancer must have been familiar with these conflicting rules and the fact that the courts of this state had never passed on the question, set the matter at rest by providing that no notice of the exercise of the option should be necessary in the contract, thereby avoiding the rule of the Wisconsin courts and adopting the rules that proceeding to collect the debt by suit or by foreclosure of the lien should constitute all the notice necessary; the holder therefore must exercise his option, not by giving notice, but proceeding to enforce his rights under the powers given, and until he has either brought his suit on the debt or started proceedings to enforce the lien

he could not be considered to have exercised his option. It cannot be understood that the parties intended that the holder of the notes could exercise his option of making the entire debt due and collectible by determining in his own mind that they were due and collectible, and let that determination remain dormant in his mind for an indefinite length of time, and kept secret from the debtor, or that he was to give his notice to a stranger to the trust deed; it cannot be understood that the debtor and creditor intended to cut off from the debtor all knowledge that creditor had exercised his option of collecting the entire debt upon default; in the clause giving the holder of the notes the option of having the entire principal of the debt due and collectible we find that it is for the purpose of suit on the debt of foreclosure of the lien; in either of the events the debtor would receive and be entitled to legal notice of the existence of the suit on the debt or the foreclosure of the lien, before the suit or proceeding could affect the interest of the debtor; then in contracting that no notice of the exercise of the option was necessary it must have been intended that the holder would not be required to give the debtor notice before he instituted his suit on the debt, or his suit of foreclosure, or directed the trustee to take possession, advertise and sell the property for the entire debt; we therefore submit to the court that under a proper construction of this clause the holder of the notes could not be deemed to have exercised his option of maturing the entire debt before he had either instituted his suit on the debt or of foreclosure or his proceedings of sale through the trustee; since the bill alleges that appellants had done neither of the above acts before the tender was made and the answer does not deny the same, we submit that appellants had not exercised their option up to the time of the tender, and the proceeding to sell afterwards was illegal and unauthorized.

It is elementary law that, in the construction of contracts, as expressed in the words they use, must govern; and that the

intent is to be collected, not from detached parts of the instrument, but from the whole of it, and all parts and every word of it, will, if possible, be given effect.

The entire sentence upon which appellants predicate their rights is as follows, to-wit:

" But should said party of the first part fail to pay any of said indebtedness at maturity . . . then the whole of the principal unpaid, whether due on the face of the notes or not, together with all accrued interest of said principal, and all other sums hereby secured, shall at once become due and collectible, for all purposes, whether for suit on the debt of foreclosure of the lien, at the option of the legal holder of the unpaid debt hereby secured, acting in person or by agent, and no notice of the exercise of such option shall be necessary; and in any such case said trustee, or his successor or successors, may, when requested, by said party of the third part or the legal holder of the unpaid debt or debts, or the agent or agents of such holder, take possession of the real estate and personalty hereby conveyed, and of the rents thereof for the current and subsequent years and in no event shall he be required to account for more than the net rents actually received by him, and then, or later, either with or without entry, sell the same at public auction for cash."

From a reading of this entire provision, even if there was nothing else in the trust deed relating to this option, it cannot be said that appellants had exercised their option of selling the property for the entire debt by only notifying the administrator of the estate of the decedent that they would proceed to exercise their rights under the deed of trust or by giving him any other notice, since such notice is declared to be unnecessary, and the doing of that which is unnecessary cannot give them any greater rights than they had before; besides if notice were necessary the heirs of the decedent would have been the proper ones to whom to have given notice; the equity of the appellees consist in the fact that the appellants did nothing more than give

the administrator notice, prior to the tender; besides the first clause states that in certain events the whole of the principal debt shall at once become due and collectible, for all purposes, whether for suit on the debt or foreclosure of the lien, at the option of the legal holder of the unpaid debt etc.: this clause, properly constructed, shows that the intent of the parties was that upon certain defaults therein mentioned the legal holder had the power to treat the whole debt due for all purposes of collection by suit or foreclosure of the lien; since in the construction of contracts the meaning of general words are restricted by more specific and particular descriptions to which they apply. Thus general words following particular or specific terms are restricted in meaning to those things or matters which are of the same kind as those mentioned. And in like manner general expressions will be restricted by particular descriptions or additions following them. 9 Cyc. 584.

The word " collectible " following the word " due " restricts its meaning to collections, and this followed by the words " For all purposes," whether for suit on the debt or foreclosure of the lien, restricts the meaning of collections to certain. means, *i.e.* he has the option of bringing a suit to collect the entire debt, or to foreclose for the entire debt, and he cannot be held to have exercised this option until he has either instituted his suit, or has proceeded under the power of sale under the trust deed; having done neither before the default was cured by the tender the appellants cannot be held to have exercised their option. Suit on the debt or proceedings to enforce the lien is the only way in which they can under this trust deed exercise their option of accelerating the maturity of the debt. *Expressio unius, exclusio alterius.*

When restrained appellants were proceeding to advertise for sale of the property, if they should seek to enforce the lien in this manner, it is necessary for them to request the trustee to act, and they cannot be deemed to have exercised this option before they have requested the trustee to advertise and sell the

property for the entire debt; since the deed of trust gives them the option of directing the trustee to sell the property only for the matured portion of the indebtedness secured, and subject to the lien of the remaining indebtedness; if they accept this option the advertisement should so state.    See trust deed.    They then have two options that they can exercise in each of which they must direct the trustee to act; they cannot certainly be deemed to have exercised either the one or the other before they have so directed the trustee.    The appellants were given the power of directing the trustee to sell for the entire debt or of directing him to sell only for the debt due on the face of the notes; it then must have been contemplated that it was necessary for the appellants to have given notice to the trustee of the exercise of their option and to have directed him to proceed to sell under the powers granted, but the answer does not allege that this was done, consequently there was no exercise of option.    It will be observed that the power given to the trustee to take possession upon the request of the holder of the notes is a part of the same sentence that gives the holder of the notes the option of having the entire debt become due for all purposes of collection by suit on the debt or foreclosure of the lien; it must therefore be a part of the exercise of the option; *i.e.* the request of the trustee to act, the taking possession of the property conveyed and of the rents for the current and subsequent years, and the sale of the property for the entire debt are all acts in the exercise of the option; and each act is of importance and necessary to be complied with in order to accellerate the maturity of the debt not due on the face of the notes; for the deed of trust provides that in the event the maturity of the unpaid portion of the debt is declared, but no sale is actually made, such declaration of maturity shall be held for naught, and the notes secured shall be deemed to mature as provided on their face; taking this in connection with the other provision it would indicate the intent of the parties was that the holders of the notes were not deemed to have exercised their

option of maturity until the sale of the property; as a part of the last provision it is declared that the right to declare due and direct the trustee to sell shall exist so long as any breach of condition, default or other failure exist, although such breach etc., may have been the ground of former declarations. This clause clearly demonstrates that a declaration of maturity, without some other act on the part of the holder of the notes, is a nullity and to be disregarded; then how can appellants successfully contend that a declaration of maturity alone without an actual sale shall be held for naught, when the trust deed requires the holder of the note to declare the debt due and direct the trustee to sell, even after a declaration of maturity had been made on the same default. We insist that, from all the provisions of the trust deed, in order that the appellants may take advantage of their option of having the indebtedness to become due and collectible by a sale under the powers, they must first direct the trustee to sell under the powers, since they have no power to sell except through the trustee, and they must act through him, and until they have so acted they have done nothing towards the exercise of the option granted.

Contracts that provide that in the event of default in the payment of an installment when due when the entire debt becomes due and payable have been repeatedly upheld by the court as matters of contract, as the contracting party has the right to make any stipulation as to when his debt may become due and payable; and the courts have held that these provisions were not such penalties and forfeitures as a court of equity will relieve against; the courts have further held that while the courts will enforce such provisions, yet they are in the nature of penalties and of forfeitures and must be strictly construed. *Chicago, etc. R. R. Co.* v. *Fosdick,* 106 U. S., 47.

The above case treating of a clause of this kind uses the following language: " and while it is in the nature of a forfeiture, it is one against which, when it has taken place according to the

fair meaning of the parties, the court of equity will not relieve.

" The stipulation, nevertheless, is in the nature of a penalty, and may be regarded as *stricti juris,* to be construed fairly and reasonably according to the meaning of the parties, but leaning, if need be, in cases of ambiguity, in favor of the debtor."

This contract, in the case now before the court, after providing that notice shall not be necessary, further provides that the trustee may when requested by the holder of the notes, take possession of the property, etc.; that the conveyance of the trustee made in pursuance of a sale shall be full evidence of due and proper request to the trustee to enforce the trust; that it shall be optional with the holder of the notes to direct the trustee to sell the property only for the matured portion of the indebtedness; and that the right to declare due and direct the trustee to sell shall exist so long as any breach of condition exists, although breach of condition may have been the ground of former declarations; that a declaration of maturity, without an actual sale, shall be held for naught; all these provisions, when construed together, according to their strict meaning, show that the declaration of maturity of itself does not accellerate the maturity of the debt, and the forfeiture of the right to redeem by paying the notes as provided on their face has not taken place according to the fair meaning of the parties, and it is the duty of a court of equity to relieve under these conditions. It is clear that the parties intended that something more than a declaration of maturity should be done before the entire debt should become due and collectible; they had no authority to declare due and direct the trustee to sell at a time in which there was no default; there is no default after a full tender of the debt due.

We submit that the record shows that the trust deed was prepared by the appellants, and therefore must be construed most strongly against them. 9 Cyc., 590.

We concede that where the mortgage provides that upon a

forfeiture of condition, such as failure to pay interest or any installment when due and payable, then the whole principal becomes due and payable, and the mortgagee has the right to foreclose for the entire debt; we also concede that the mortgagee has the same right where the mortgage provides that upon a default in the payment of the interest for thirty days the whole principal debt becomes due and payable, the mortgagee has the right to foreclose for the entire debt after the expiration of the thirty days; since the courts can only enforce contracts as they are written and cannot make them for the parties, this principal has been repeatedly held by the courts as will be seen in the cases cited in 1 Pomeroy's Eq. Jur., § 439.

We concede further that after the debts have matured as provided in the trust deed, the debtor cannot satisfy the conditions of the trust deed without the payment of the entire debt; but we insist that, when the deed of trust provides, as does this one, that after default the debts become due and collectible at the option of the holder of the notes, the holder cannot insist on the payment of the whole debt before he has exercised his option in the manner stipulated in the instrument (the manner to be strictly followed), and that a tender of the amount due on the face of the notes before that time satisfies the conditions, and will prevent a sale for that default. 28 Am. & Eng. Ency. Law, 780; *Flower* v. *Elwood,* 66 Ill., 438; *Whelan* v. *Reill,* 61 Mo., 565; *Lapsley* v. *Howard,* 119 Mo., 489; *Wolz* v. *Parker,* 134 Mo., 458.

The right to redeem is a favorite equity, and will not be taken away, except upon a strict compliance with the steps necessary to divest it. *Howell* v. *Western R. R. Co.,* 94 U. S., 463; *Hurd* v. *Chase,* 32 Ill., 45; *Niles* v. *Ransford,* 1 Mich., 338; *Bent-Otero Imp. Co.* v. *Whitehead,* 71 Am. St. Rep., 328; *Stevens* v. *Clay,* 31 Am. St. Rep., 328.

Counsel for appellants cites a number of authorities to show the contrary view, and that a tender or payment of the interest does not satisfy the conditions, but in each of the cases cited

the whole debt was either matured by the operation of the contract itself or the mortgagee has elected to have them become due, and the authorities therefore do not apply to this case.

Argued orally by *J. B. Harris* and *Edward Mayes,* for appellant, and by *Monroe McClurg* and *E. V. Hughston,* for appellees.

MAYES, J., delivered the opinion of the court.

The facts in this case are that on the 14th day of November, 1904, W. H. Morgan purchased from the heirs of Matilda W. Caldwell, deceased, certain lands in Leflore county, Miss. The amount agreed to be paid for this purchase was $45,000. This amount was not paid in cash, but Morgan executed a deed in trust to secure this sum, in which he was joined by his wife, Margaret C. Morgan. The deed in trust covered the property purchased, and the other property in the same county belonging to the Morgans. When this deed in trust was executed for the place bought from the Caldwell heirs by W. H. Morgan, there were executed five principal notes for the sum of $9,000 each, the first principal note falling due on November 14, 1909, and the other notes falling due annually, the last one being payable on November 14, 1913. These notes were executed as principal notes. Interest notes were executed separately. In addition to the five principal notes set out, there were executed forty interest notes for $540 each, made payable in such way as that five of the interest notes fell due annually; the first five falling due on November 14, 1905, and the last five falling due on November 14, 1913. Each of these interest notes were interest-bearing after their maturity. All the notes were executed on the 14th day of November, 1904. In September, 1905, and after the maturity of the first five notes of $540 each, W. H. Morgan died intestate, leaving as his heirs at law all the appellees except Kimbrough, who was appointed administrator of the estate. In this attitude of affairs, and before the maturity of the interest notes, Jas. E. Caldwell, acting for

himself and the other appellants, and being a beneficiary in the deed in trust, wrote to the administrator on October 10, 1905, calling his attention to the fact that the first installment of interest was due on November 14th following, and asking the administrator where the notes should be presented for payment. Not having received any reply to this letter, on the 6th day of November following Caldwell wired Kimbrough, asking whether or not he would be prepared to pay the interest notes on the 14th day of November, and asking where the notes should be sent for collection. Kimbrough replied to this telegram on the 7th of November as follows: " I received your telegram, but have delayed replying until this afternoon in order to answer advisedly. So far, only one hundred and thirteen bales of cotton have come to hand. About ninety bales of cotton are now on the boat, but this will not be enough to meet the debt secured by the crop, so I will have to ask you to hold the notes until a later date when they can be paid. The crops are shorter than I have ever known and the harvest is progressing slowly. I feel safe in saying that I can get in enough in the near future to pay the notes." On the 9th of November, in reply to this letter, Caldwell wrote: " I have to say that there is no disposition on my part, at least, not to grant a reasonable delay on the notes due the 14th instant. However, I would like to know from you definitely what length of time you would expect and desire." Kimbrough made no reply to this letter, whereupon, on the 27th. day of November, Caldwell telegraphed: " Please let me have an answer to my letter of November 9th." On the 7th of December, 1905, still having no answer from Kimbrough, Caldwell wrote: " I have not yet received any reply to my telegram to you, asking what length of time you would likely desire in which to pay the interest notes on the purchase of the Caldwell place. Please let me hear from you in regard thereto by return mail or telegram, and greatly oblige." On the 12th of December, 1905, Caldwell wrote as follows to Kimbrough: "Your letter of the 9th inst. is received, from which I infer that you are not in a posi-

tion to make any definite promises in regard to taking up the interest notes on the Caldwell place.   Indeed, you state that you will not be able to do so.   We, therefore, proceed to exercise our rights under the deed of trust which will simplify matters."

From the foregoing facts, as shown by the correspondence between Caldwell and Kimbrough, it will be seen that before the maturity of the notes it was manifest that Caldwell was going to insist upon their payment.   It is also manifest that up to the 12th day of December, when he declares it his purpose to proceed to exercise his rights under the deed in trust and foreclose same, that neither by act, nor word, had there been anything said to Kimbrough by Caldwell which could in any way mislead Kimbrough to his prejudice, as administrator, or lull him into any fancy or belief that the payment of these notes was to be postponed.   The failure of Caldwell to insist upon the payment of the notes on the date at which they fell due was at the instance and request, and for the benefit, of the administrator.   As soon as Caldwell discovered the fact that the administrator was pursuing a policy of delay in the payment of these notes, he declared it his purpose to proceed to exercise his rights as set out under the deed in trust.   While the declaration of this purpose was not made on the very date that these notes fell due, to-wit, on November 14, 1905, it was made a little less than 30 days from that date, and the delay of Caldwell in declaring his purpose to exercise his rights under the deed in trust was caused by the request of Kimbrough, the administrator, and manifestly under the belief that these notes would be met.   Immediately it became known to Caldwell that the notes were not to be paid promptly, he declared it his purpose to proceed to exercise his rights under the deed in trust. After the above correspondence, there were a number of letters passed between Kimbrough, the administrator, and Caldwell, commencing December 14, 1905, and ending about June 6, 1906, the purport of which was an insistence by the administrator on the allowance of time in which to pay

the notes.    During this correspondence, the declaration of Caldwell of his intention to proceed under his deed in trust was made on the 12th day of December, 1905, but no action was taken by him to sell the property.    The matter was merely held in abeyance, at the earnest request of the administrator, the administrator insisting that if the sale was made of the property it would result in great loss to the estate.    Such was the condition of affairs, and such was the reason for the delay on the part of Caldwell up to the time at which the estate was advertised by the trustee for sale.    The whole record shows that Caldwell was always insisting upon the payment of his entire debt, and that the administrator was earnestly asking indulgence from him, in order that he might have time in which to raise the money with which to discharge this debt.    The record fully establishes the fact that all the delay about the sale after the declaration of an intention to foreclose made by Caldwell was a mere indulgence on his part, in an effort to oblige Kimbrough, the administrator, and Caldwell was insisting all the while on the payment of his entire indebtedness.    In order that there might be no misapprehension on the part of the administrator as to this, and because of a letter received from Kimbrough, the administrator, on June 4, 1906, Caldwell wrote to Kimbrough on the 6th of June as follows:    " I acknowledge receipt of your letter of June 4th from Greenwood, Miss., from which I infer that there is a possibility of a misunderstanding between us with regard to the payment of our claims against this estate.    Now, in order that there can be no possible misunderstanding, I have to say that we consider our entire claim has matured and is now past due against said estate, amounting to $45,000, with interest from its original date.    That we have our rights secured to us by an instrument of writing, duly recorded, which gives us power to sell and dispose of the security thereunder, to-wit — the plantation known as the Caldwell Place and the plantation known as the Macon Lake Place.    We have, therefore, signified our willingness, in deference to the expressed wishes

of yourself and the adult heirs of the estate and consented to a postponement of the sale of this property until the 1st of October, 1906, on the expressed condition that you, as representative of said estate, would put yourself in position to actually dispose of said properties on that date at public sale, provided they shall not have in the meantime been disposed of at private sale." Now, it will be seen that on December 12, 1905, the debt not being then paid, and again on June 6th, reaffirming the declaration of December 12, 1905, Caldwell, as representative of the appellants, at both times declared it to be his purpose, exercising the option in the deed in trust, to declare the whole debt due and to foreclose for the purpose of paying this debt. All the debt secured by the notes was due and unpaid on the 12th of December, 1905, and it was due and unpaid on the 6th of June, 1906. At no time, from the first declaration on the 12th of December, 1905, up to June 6, 1906, was there any waiver of the purpose of Caldwell to declare this entire debt due, and to ask a foreclosure for the entire sum, and the deed in trust expressly provides that the trustee may make sale at any time after default, and for any amount that may be due and unpaid. All indulgences were granted at the request of the administrator, for his benefit, and at no time did Caldwell do anything in prejudice of the rights of the appellee, or anything which by any possibility could mislead him in any way.

We do not deem it necessary to set out the facts of correspondence any further than we have done. There was failure to pay this debt. The correspondence continued on down through July, August, September, and October. After all this correspondence, and before the actual sale of the property was advertised to take place, the administrator tendered to Caldwell the amount of interest, expenses, and costs due up to the date of the tender. This tender was declined. The tender was declined on the ground that the amount due was the full indebtedness, and that the beneficiaries would insist upon full payment, and would accept nothing less than the amount called

for under the deed in trust. After the tender was declined, the property was advertised for sale, and before the date of sale arrived the trustee was enjoined from making the sale. There was a motion to dissolve, the motion overruled, and appeal taken to this court.

The correspondence in the case, coupled with the exhibits and the bill in answer, make out a complete case. The whole case turns upon the construction that is to be given to certain provisions of the deed in trust. The provision of the deed in trust which we will notice first is that provision which provides for the maturity of the entire debt on the failure of the mortgagors to pay any part of the indebtedness secured by the deed in trust at the maturity thereof. That provision is this: " Should said party of the first part fail to pay any of said indebtedness at maturity, or fail to pay any taxes before delinquency, or insurance premiums when due, or to keep and perform any other act, obligation or covenant hereof, or in case there should be any claim, lien, or incumbrance affecting the property prior to this trust deed, then the whole of the principal unpaid, whether due on the face of the notes or not, together with all accrued interest of said principal and all other sums secured, shall at once become due and collectible, for all purposes, whether for suit on the debt or foreclosure of the lien, at the option of the legal holder of any unpaid debt hereby secured, acting in person or by agent, and no notice of the exercise of such option shall be necessary, and in such case such trustee, or his successor or successors, may, when requested by said party of the third part, or the legal holder of the unpaid debt or debts, or the agent or agents of said holder, take possession of the real estate, and personalty hereby conveyed, and of the rents thereof for the current and subsequent years, and in no event shall he be required to account for more than the net rents received by him, then or later, either with or without entry, sell the same at public auction for cash." The unmistakable purpose of this provision in the deed in trust was to accellerate the

time of payment of an already existing debt on the failure of the mortgagors to pay promptly. This provision in the deed in trust is in no sense a penalty. It imposed no additional obligation upon the mortgagor. He is not called upon to pay any more than he would have paid by the terms of the original contract. This provision is a valid provision and sustainable in any court, both in law and in equity. In 1 Pomeroy, § 439, it is stated: "If a certain sum is due and is secured by any form of instrument, and is made payable in specified installments, with interest, at fixed successive days in the future, and a further stipulation provides that in case of a default in the prompt payment of any such installment in whole or in part at the time prescribed therefor, then the whole principal sum of the debts should at once become payable, and payment thereof could be enforced by the creditor, such stipulation has nothing in common with the penalty, and is as valid and operative in equity as at the law." This text is sustained by numerous authorities. In truth, as to the validity of this provision in a deed in trust, there is very little, if any, dissent in the authorities. The question then is, this being a perfectly valid situation, has there been any failure on the part of the mortgagors to pay any of such indebtedness at maturity? If there has been, and the mortgagees have in no way waived this provision in the deed in trust, then they have the right, at their option, to declare the whole of the debt due, both as to principal and interest, under the terms of the deed in trust. In the light of this record, it can never be doubted that when this money became due, as provided in the deed in trust, it was not paid, and therefore on the 14th day of November, 1905, the mortgagees unquestionably had the right to mature this entire indebtedness. Did they do so? It was not necessary, under any of the provisions of the deed in trust, for the mortgagees to make their declaration of intention to exercise their option *eo instanti* the failure to pay occurred. By the terms of the deed in trust, it is provided that on default in the payment of any such indebt-

edness the whole amount of principal unpaid, and interest on said principal, and all other sums secured, whether due or not, shall become due and collectible for all purposes at the option of the legal holder, and no notice of the exercise of such option shall be necessary. The mere fact that these notes were due. and unpaid was, in and of itself, notice to the administrator that the mortgagees had the right to exercise their option at any time, and it was not necessary to give him any further notice than that contained in the instrument itself. It was not necessary for this option to be exercised at once in order to make it valid. It was only necessary that the mortgagees exercise this option with such reasonable expedition as that the mortgagors might not be lulled into the belief that the rights under this deed in trust were to be waived. It is true that the mortgagees might have estopped themselves by laches, or other conduct amounting to an estoppel, from asserting their option under this contract. In truth, the court would seize upon every slight circumstance on the part of the mortgagee, where it operated prejudicially to the debtor, as a waiver of the right to declare the entire debt due, but in this case the mortgagee has done nothing that could have that effect, but quite the contrary. All the delay that was caused was brought about through the instrumentality of the administrator. If anybody's rights are prejudiced by this delay, it has been the rights of the mortgagee and not the mortgagor. The failure to act at once was for the sole and exclusive benefit, and .at the earnest instance and request, of the debtor. Mere indulgence of time, such as existed in this case, under the facts in this case, did not of itself operate as a waiver.

After the failure to pay at maturity had occurred, and the option to declare maturity of the entire debt had been exercised, the great weight of authority is that it was too late then to tender the amount due under the deed in trust up to the time of the default, and thereby defeat the right to mature the entire debt. By the terms of this deed in trust it is expressly

provided that the right to declare the entire amount of the deed in trust due, and direct the trustee to sell, shall exist so long as there is any breach of a condition of a default, or other failure exists.   The right to declare the entire debt due, at the option of the mortgagee, by the terms of the deed in trust, exists so long as there is any breach of a condition as to payment.   If the mortgagee had the right to declare this entire debt due because of the default of the mortgagors in meeting the payments when they became due, and they have exercised that right, the mortgagors could not defeat the mortgagees in the exercise of their option to declare the entire debt due by a tender merely of the amount then due, and thereby defeat the sale.   It is too late after the forfeiture has occurred and the option has been exercised.   As we have shown, the contract which provides for the acceleration of the payment on the failure of the debtor to meet the notes at maturity is a perfectly valid contract both in law and in equity.   It is not a penalty, and therefore, when the equity court is appealed to, merely for the purpose of preventing an enforcement of this contract right, unaccompanied by any acts of estoppel on the part of the mortgagee, the court will decline to interfere.   After default had occurred and the option has been declared, it is too late to defeat its effectuation by a tender merely of the amount due at the time of the default. Jones on Mortgages, § 1185; *Ib.* section 1186; *Morling v. Bronson,* 37 Neb., 608; 56 N. W., 205; *Swearingen v. Lahner et al.,* 93 Iowa, 147; 61 N. W., 431, 26 L. R. A., 765, 57 Am. St. Rep., 261; Ency. Pl. & Pr., vol. 9, p. 237; *Van Vlissingen v. Lenz,* 171 Ill., 162; 49 N .E., 422; *Hoodless v. Reid et al.,* 112 Ill., 105.

The deed in trust further provides that:  " In the event maturity of the unpaid portion of the debt is declared, but no sale is actually made, such declaration of maturity shall be held for naught, and the notes hereby secured shall be deemed to mature as provided on their face."   It is contended by appellees that by virtue of this provision, when there has been a declara-

tion of maturity, not followed immediately by a sale of the property, the right to insist upon full payment of the entire indebtedness is lost, and that the mortgagors have the right at any time, before the actual sale, to tender the amount due up to the date of the tender and stop any subsequent sale. On the other hand, appellants claim that this clause of the deed in trust is a mere limitation clause. Appellants claim that this clause was inserted for the protection of the beneficiaries in the event they declared the entire debt matured, but did not proceed to sell so that the statute of limitations would not commence from the date of the declaration of maturity, but from the date the notes matured under the terms of the contract. We do not feel called upon in this case to say which of these contentions is correct, since appellees are not in an attitude to avail themselves of the failure of mortgagees to sell. Why did not appellants proceed at once to exercise their option to declare the maturity of the entire debt, and proceed to foreclose the mortgage? The answer is in the record. The first notes matured on November 14, 1905. After the death of Morgan in September, 1905, and the appointment of Kimbrough as administrator of the estate, on October 10, 1905, Caldwell, for himself and as representative of all beneficiaries, wrote to Kimbrough, as representative of the Morgan estate, calling his attention to the notes and the date of their maturity, and asking where they should be presented for payment. Not receiving any reply, on November 6th following he wired Kimbrough to let him know if he, Kimbrough, would be prepared to pay the notes on the 14th instant. Kimbrough replied on November 7th, stating that he felt safe in saying that he could get enough in the near future to pay the notes. Kimbrough also stated that he would have to ask that the notes be held until a later date. On the 9th of November Caldwell replied that he had no objection to granting a reasonable delay, but would like to know definitely what time he wanted. On the 27th of November, not having heard from Kimbrough, Caldwell wired requesting that Kimbrough an-

swer.   On the 7th of December, still receiving no answer, Caldwell wrote again, requesting Kimbrough to reply to him.   Afterwards, on the 12th of December, the reply of Kimbrough not being satisfactory, Caldwell declared the maturity of the debt, and has steadfastly held to that declaration of maturity down to the date the sale was enjoined.   The record shows that the failure to proceed to sell, after the declaration of maturity, was at the instance and earnest insistence of Kimbrough, and that all failure to act occurred in an effort to oblige the administrator, and that finally, because Caldwell had been postponed from time to time without settlement of the debt, he ordered the trustee to proceed to sell.   Under these conditions, can the administrator defeat the sale by setting up the fact that the mortgagees did not act at once and sell ?   An executor or administrator, in his capacity as such, and dealing with the matters about which he may lawfully exercise authority, is as much bound by the law of estoppel as if he were acting in his individual capacity.   There may be cases when his acts as administrator create an estoppel on him as such, and the estoppel acts prejudicially to the interests he represents, where he may be made liable on his bond to the extent of the injury sustained by the estate; but he is bound by his acts of estoppel just as if he were acting in his individual capacity.   *Butler* v. *Gazzman,* 81 Ala., 491, 1 South., 16; *McDonough* v. *Hanifan,* 7 Ill., App., 50; *Thomas* v. *Brooks,* 6 Tex., 369; 18 Cyc., 211, citing many authorities.   This announcement of the law is not in conflict with *Glenn* v. *Thistle,* 23 Miss., 42.   In the case, *supra,* it was merely held that no estoppel could so operate as to permit the executor of an estate to make valid an obligation entered into by his testator, when the obligation was a nullity at the date of the death of the testator.   In the case of *Lewis* v. *Lusk,* 35 Miss., 696, 72 Am. Dec., 153, it was held that an estate could not be estopped from asserting its title to property by the mere silence of the administrator.   These cases are quite distinct from the case at bar.   By the application of the doctrine

of estoppel in this case, the administrator is not divesting the estate of any title which it heretofore held, nor is it renewing or reviving any debt which the estate was not already liable for. It is applied to prevent the estate defeating contract rights of parties acquired before there was any administrator, and, if to be lost, must be lost solely because the administrator is acting in a representative character, and cannot therefore estop the estate. The business about which the administrator was engaged was a business connected directly with his duties as administrator, and he was acting in or about those duties. By every principle of right, the doctrine of estoppel applies to an administrator under these circumstances, just as it would apply to an individual in his own affairs.

Under the facts in this case the test is, would Morgan himself have been estopped to set up the failure of the mortgagees to proceed to sale? If so, then the administrator is estopped.

The motion to dissolve the injunction is sustained, and the injunction here dissolved, and the cause *reversed and remanded.*